FILED 4 AUG '23 16:14 USDC-ORP

# UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
### PORTLAND DIVISION

**Elizabeth A. Weber,**

**Plaintiff Pro Se**

Case No. _3:23-CV-1143-SB_

**COMPLAINT FOR
CIVIL CASE
EMERGENCY REQUEST**

**v.**

**Oregon Bureau of Labor and Industry (BOLI),
Community Action Partnership of Oregon (CAPO),
Oregon Housing Community Services (OHCS)**

**Respondents**

1

I. **Basis for Jurisdiction**

This court has jurisdiction under *28 U.S.C. § 1331* for claims arising under the laws of the United States, under *42 U.S.C. § 3612(o)* for violation of the Fair Housing Act, and under *28 U.S.C. § 1367(a)* for supplemental jurisdiction of state law claims.

II. **The amount in controversy** I calculated the expenses at monthly rates that if I had housing would cost on average $1600 per month for rent, not including utilities and other living expenses. 10 months at $1600/month = $16,000 x the number of counties who have deprived me of housing due to discrimination and retaliation is 12 = $192,000 plus out of pocket expenses, emotional, physical, and psychological trauma, and any other relief the court may grant.

III. **Laws in Support**

A. *Americans with Disabilities Act: Title III of the Americans with Disabilities Act prohibits discrimination against persons with disabilities in places of public accommodations …*

B. *Attorney General certification (202) 307–0663Sec. 12202. State immunity*

C. *Title VII of the Civil Rights Act of 1964.*

D. *49 CFR § 24.205(c)(2)(ii)(D)*

E. *Section 504 of the Rehabilitation Act (29 U.S.C. 794)*

F. *42 U.S. Code § 1437f*

G. *24 CFR § 576.401(a)*

H. *24 CFR § 576.400(b) and (c)*

I.    *24 CFR 5.2005*

J.    *§42.106(b) (DOJ).*

K.    *42 U.S. Code § 12132 - Discrimination*

L.    *42 U.S.C. § 3604 ("(B) a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations ... dwelling; or")*

M.   *42 U.S.C. § 3604 (C) The Secretary shall encourage, but may not require, States and units of local government to include in their existing procedures for the review and approval of newly constructed covered multifamily dwellings, ... (3)(C), and shall provide technical assistance to States and units of local government and other persons to implement the requirements of paragraph (3)(C).")*

N.    *42 U.S.C. § 3604 ("(b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin.")*

O.    *42 U.S.C. § 3604 (2) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of ...*

P.    *FHA § 3604(f)(1) and (2) Discrimination of handicap status by the refusal to rent; discrimination in the terms, conditions, and privileges of the rental of a dwelling*

Q.    *FHA § 3604(f)(3)(B) refusal to make reasonable accommodations in rules, policies, practices*

R.    *FHA § 3604(c) notice and statement of preference, limitation, or discrimination based on handicap*

S.   *FHA § 3617 statements intended to coerce, intimidate, threaten, or interfere*

T.   *42 U.S.C. § 3604 ("AMENDMENTS1988- Pub. L. 100-430, §6(e), inserted "and other prohibited practices" in section .Subsecs. (a), (b). Pub. L. 100-430, §6(b)(2), inserted "familial status," after "sex,".Subsecs. (c) to (e). Pub. L. 100-430, §6(b)(1), inserted "handicap, familial status," after "sex,".Subsec. (f). Pub. L. 100-430, §6(a), added subsec. (f).Subsec. (f)(3)(A).")*

U.   *ORS 659A.003(3)*

V.   *ORS 659A.145*

W.   *ORS 659A.403 Discrimination in place of public accommodation prohibited*

X.   *ORS 659A.406 Aiding or abetting certain discrimination prohibited*

Y.   *ORS 659A.421 Discrimination in selling, renting or leasing real property prohibited*

Z.   *Or. Rev. Stat. § 90.385(1)(a) - (1)(c) (2023)*

AA.  *Or. Rev. Stat. § 90.385(2) (2023)*

BB.  *Or. Rev. Stat. § 90.385(3) (2023)*

## IV. Statement of Claim

The Federal Government provides low-income housing tax credits that are distributed to developers through designated state agencies. 26 U.S.C. § 42. Congress has directed States to develop plans identifying selection criteria for distributing the credits. § 42(m)(1). Those plans must include certain criteria, such as public housing waiting lists, § 42(m)(1)(C), as well as certain preferences, including that low-income housing units "contribute to a concerted community revitalization plan" and be built in census tracts populated predominantly by low-income residents.

§§ 42(m)(1)(B)(ii)(III), 42(d)(5)(ii). Oregon's housing agencies and other agencies in the community across the counties, along with their oversight agencies have consistently created and allowed a disparate impact on the women in these communities. Especially disabled Domestic Violence Victims. There are less discriminatory alternatives available to provide equitable treatment and inclusion for services and housing.

Disparate impact regulations seek to ensure that programs accepting federal grant money are not administered in a way that perpetuates the abuse caused by past discrimination. The Supreme Court explained, that even benignly motivated policies that appear neutral on their face may be traceable to the nation's long history of invidious race discrimination in employment, education, housing, and many other areas. *See Griggs v. Duke Power Co., 401 U.S. 424, 430–31 (1971); City of Rome v. United States, 446 U.S. 156, 176–77 (1980); Gaston Cty. v. United States, 395 U.S. 285, 297 (1969).*

Additionally, under the *Attorney General certification (202) 307–0663Sec. 12202. State immunity;* A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter. In any action against a State for a violation of the requirements of this chapter, remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in an action against any public or private entity other than a State.

V.      **Facts**

The Exhibits A1-17, B1-52, C1-32 provide a small sample but show by preponderance of the evidence that I have been discriminated against time and again by agencies in Oregon, not just for my disabilities but also because I am a homeless, single white female, Domestic Violence Victim without children under the age of 18, and I am not a refugee, male, religious, Veteran, Hispanic, person of color, Native American (I am, however this state won't recognize it) aged, disabled-enough, LGBTQ+, addict, parolee, or migrant worker.   Disparate impact is probative of discriminatory intent, particularly when the disparate impact is extreme in magnitude. (See *Arlington Heights, 429 U.S. at 266).*  I have endured this treatment from law enforcement, housing authorities, hospital staff, non-profits, property managers, domestic violence and homeless shelters, physicians, insurance companies, hearings offices, agencies charged with oversight, real estate developers, district attorneys, SSA, DHS, and state governments for almost a year.

I do not quite fit into anyone's formatted checklist, so I am left out but also prevented from accessing programs and services. Even attempting to get assistance from DV based programs like The Harbor in Astoria is plagued with impossible requirements or blatant hatred as they cater to LGBTQ+ victims. The highly disparate rates at which men and women are subjected to domestic violence also evince the sex-based nature of this phenomenon. Research indicates that 90 to 95% of domestic violence victims are women. *(See U.S. Dept of Justice Bureau of Justice Statistics, Domestic Violence-Violence Between Intimates 2 (1994) http:// bjs.ojp.usdoj.gov/content/pub/pdf/vbi.pdf.)*

*Oregon eo-23-02* states in part; Above all, unsheltered homelessness leads to widespread human suffering. According to the United Nations Human Rights Office of the High Commissioners, Homelessness is a profound assault on dignity, social inclusion, and the right to life. It is a prima fascia violation of the right to housing and violates a number of other human rights in addition to the right to life, including non-discrimination, health, water and sanitation, security of the person, and

freedom from cruel and degrading and inhumane treatment. Undoubtedly people experiencing unsheltered homelessness are suffering most acutely, but Oregonians with housing also suffer significant moral injury as a result of the crisis of homelessness in our state. As defined by a Syracuse University, moral injury means" the damage done to one's consciousness or moral compass when that person perpetuates, witnesses, or fails to prevent acts that transgress one's own morals, beliefs, values, or ethical codes of conduct."

Oregon Housing and Community Services and other state agencies fail to implement proper guidelines and oversight for inclusive practices for Domestic Violence Victims, disabled people, or people without children under 18, even though you are still financially responsible for them and would have them with you if it was not for the restrictive guidelines imposed by policy.  Because of continued sex discrimination, there is a disproportionately adverse effect on women in the housing services community. Failure to account for abused women, especially disabled victims, as a significant risk group when implementing policy and dispersing grant funding causes further irreparable harm. There is no justifiable or legitimate rationale for the continued exclusion of women. *(See Inclusive Communities, 135 S. Ct. at 2513 (quoting Ricci v. DeStefano, 557 U.S. 557, 577 (2009). and When Domestic Violence and Sex-Based Discrimination Collide: Civil Rights Approaches to Combating Domestic Violence and Its Aftermath (2011)* https://via.library.depaul.edu/jsj/vol4/iss2/5 and *Treatment based on gender stereotypes is a form of intentional sex-based discrimination under Title VII of the Civil Rights Act of 1964.) and Gamble v. City of Escondido, 104 F.3d 300, 304 (9th Cir. 1997) ("We apply Title VII discrimination analysis in examining Fair Housing Act.. .discrimination claims"); Larkin v. Michigan Dep't of Social Servs, 89 F.3d 285, 289 (6th Cir. 1996) ("Most courts applying the FHA...have analogized it to Title VII of the Civil Rights Act of 1964.")*

**A. Yamhill County Action Partnership (YCAP) who runs the Coordinated Entry (CE) system and Housing Authority of Yamhill County** Did these agencies discriminated against me with intentional sex-based discrimination, violate policy, and discriminate against my disabilities? I would answer yes as I was denied services by both YCAP and Yamhill Housing Authority over the last 8 months when requesting access to housing and services.

**(See Exhibit C1-5) denial letter and** *Department of Housing and Urban Development (HUD) found probable cause that the zero-tolerance policy contravened the FHA. 199 EMILY J. MARTIN & DEBORAH A. WIDISS, supra note 160, at 5.*

Yamhill Community Action Partnership "NEEDS ASSESSMENT" Report 2018-2019 (See be;pw) 84 pages has the word veteran mentioned 24 times, youth 21 times, disabled/disabilities 17, but Victim was not mentioned at all and Domestic Violence was mentioned 7 times with 2 of the 7 saying the same thing; "Car break in's seem to be increasing here, domestic violence and gang tags are appearing. Things are being vandalized. We don't have many sheriff deputies out here."

The only other time Domestic Violence was mentioned, it made reference (showing they are aware of the situation) to the "severity of the disparities for victims because they lack available housing,"

NEEDS ASSESSMENT; DOMESTIC VIOLENCE (21 .17%)

• "Our community needs more places for domestic violence mothers and kids to go."

• "Domestic violence housing is completely unavailable."

Exhibit C-20 This was an assessment done 4.5 years ago, so the percentage would increase to reflect today accurately.

Fewer or inferior services or benefits were afforded to me over several months of requesting assistance from YCAP and Yamhill HA. They denied me something financially and fundamentally desirable. Those actions violate my rights under Title VI adversity/harm protections because their policies and practices resulted in fewer or no services or benefits. (See Larry P. v. Riles, 793 F.2d 969 (9th Cir. 1986). They pay deposit assistance for people but only when those requestors were to be residents in the housing project they owned. YCAP provided $16, 229 in deposit assistance only to tenants residing within Camilla Court Housing Project.

(See YCAPs Financial audit) They were willing to invest the deposit assistance for tenants that would be moving into their personally owned property, however not able to provide it to members outside of ability to recoup the money and add to their own profit gains, which violates Title II of the Federal Regulations and shows clear bias and preferential treatment. I could draw the same conclusion for the rental income, however time did not allow for it, nor did my limited cognitive functional capacity.

Exhibit C-24 YCAP Financial Audit On page 12 defines net assets with and without donor restrictions; "net assets without donor restrictions- net assets subject to donor imposed restrictions may or may not be met either by actions of the organizations and/or the passage of time. When a restriction expires, net assets with donor restrictions are transferred to net assets without donor restrictions and reported in the consolidated statements activities as net assets released from restrictions."

However their audit stated there were no material weaknesses found and that they were compliant on every account. They could not be compliant because there are other people that have requested deposit assistance from them that were turned down unless they were tenants residing in Camille Court

Apartments. I think it is safe to say I am not the only person in the state of Oregon who requested deposit assistance from YCAP. *(See § 42.106(b) (DOJ). This provision also requires the primary recipient to obtain from its subrecipients, and have available for agency review, such compliance reports "as may be necessary to enable the primary recipient to carry out its obligations.")*

Yamhill Community Action Partner was supposed to issue me an EHV, but violated my rights when they ignored my numerous reasonable accommodation requests to modify policy. including a reasonable accommodation for modification of their policy to YCAP, on Yamhill Community Action Partners refused to assist me for deposits, rent assistance, moving expenses, application fees, ignored my reasonable accommodation requests and requests for financial statements. Exhibit C-1-C-5, C-8-10, C-14-24

The rules listed by *Legislature at 458.065-458.210 Housing and Community Services Programs; Individual Development Accounts* uses the following descriptive words when referencing assistance for citizens in Oregon;

"culturally specific groups/organizations, youth, low and very low income, veterans, homeless, aging, disabled, ethnic, Indian, color, tribes, children, family, housing instability, individual, agricultural worker, persons over 65, persons of color, indigenous people, occupant, resident, homeowners, renter, person, at-risk, unsheltered, migrant, and religious. " Exhibit C-27-28

Not once in the 54 pages of rules did the Oregon Legislature use or reference the word *Victim,* to include Domestic Violence Victim's in their policy. If the word victim is not included or referenced in any for the laws governing the community services and programs, then how is there inclusion and

equity for women who are Victims of Domestic Violence? This neglect demonstrates disparity for women and is considered sex discrimination. Another example of sex-based disparity is the following law, as it would suggest that Veterans receive 25% of the federal anti-poverty grant, leaving the remaining 75% for the rest listed above, minus Domestic Violence Victims as they are not accounted for at all;

28 C.F.R. § 42.104(b)(2) A recipient, in determining the type of disposition, services, financial aid, benefits, or facilities which will be provided under any such program, or the class of individuals to whom, or the situations in which, such will be provided under any such program, or the class of individuals to be afforded an opportunity to participate in any such program, may not, directly or through contractual or other arrangements, utilize criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program as respects individuals of a particular race, color, or national origin.

Perhaps this is why in 2012 Patricia Gouveia and Peggy Roberson filed the complaint in Coos County Circuit Court against the Oregon Coast Community Action Agency for sex-based discrimination. I too have been discriminated against by ORCCA in 2022 when I reached out to them for services after North Bend Housing Authority took the Housing Choice Voucher (HCV) that I had transferred to Oregon under a VAWA implemented emergency transfer. Not only is it a violation of my VAWA protections, but Oregon was under a state of emergency as per *EO 26* (Exhibit C30-31) and there were 1115 waivers in place. Any of these and many other options would have had a less discriminatory alternatives available to provide equitable treatment and inclusion for services and housing.

Shortly after, I submitted a complaint to HUD on March   I could not get a response from Bureau of Labor and Industry regarding the complaint I filed with them on          . Several times I would simply be ignored, however finally scheduled a time with me for an assessment. Our agreed upon appointment time was missed by BOLI. Following attempts to communicate were ignored. HUD dismissed my claim, however stated that I could file for retaliation. I thought that comment was odd and could never understand why it was said, but now I know why. See Exhibit      North Bend Housing authority never addressed my reasonable accommodation requests, my hearing request, my request for an exception to policy to allow my voucher to cover an extra $80 for a HAP so that homeless population, knowing that I was a disabled victim of domestic violence. Would $80 more in a HAP payment be financially impractical or fundamentally against policy to approve?

Housing policies and practices that burden victims of domestic violence have a disparate impact on women, and as such, are proscribed under Title VII, regardless of discriminatory intent. Because women make up 90 to 95% of domestic violence victims, policies and practices that place survivors of domestic violence at a special disadvantage in housing have a disparate impact on women and thus run afoul of Title VIII.  Is it fair to say that Legislature's intent when providing protections under Title VII, those same protections would apply to Title VIII? *When Domestic Violence and Sex-Based Discrimination Collide: Civil Rights Approaches to Combating Domestic Violence and Its Aftermath (2011) https://via.library.depaul.edu/jsj/vol4/iss2/5*

It is stated in ORS 458.505 Community action agency network as delivery system for federal antipoverty programs grant funding and states; "*The department, in its sole discretion, may allocate the funds in any method that ensures statewide geographic coverage without regard to an existing distribution formula, including through a competitive grant or contract process. [2020 s.s.2 c.10 §41]* but this conflicts with ORS 458.650 Emergency Housing Account; grant policies

(7) Twenty-five percent of moneys deposited in the account pursuant to ORS 294.187 are dedicated to the emergency housing assistance program for assistance to veterans who are homeless or at risk of becoming homeless. [1991 c.740 §7; 2007 c.70 §268; 2011 c.605 §2; 2013 c.646 §3; 2015 c.180 §27; 2017 c.350 §1; 2019 c.576 §5; 2021 c.18 §7; 2021 c.448 §5a. How can you apply 25% to veterans and it not be considered exclusive? Shouldn't the weight of race, age, disability, gender, homelessness be equitable? Shouldn't all groups get equal access to funding for housing? By reserving a specific amount for any category, it discriminates against another unless NBHA did not regard policy, my rights, or state law to consider that an exception could be applied due to the state of emergency and the homeless population, knowing that I was a disabled victim of domestic violence. Would $80 more in a HAP payment be financially impractical or fundamentally against policy to approve?

Housing policies and practices that burden victims of domestic violence have a disparate impact on women, and as such, are proscribed under Title VII, regardless of discriminatory intent. Because women make up 90 to 95% of domestic violence victims, policies and practices that place survivors of domestic violence at a special disadvantage in housing have a disparate impact on women and thus run afoul of Title VIII. Is it fair to say that Legislature's intent when providing protections under Title VII, those same protections would apply to Title VIII? *When Domestic Violence and Sex-Based Discrimination Collide: Civil Rights Approaches to Combating Domestic Violence and Its Aftermath (2011)* https://via.library.depaul.edu/jsj/vol4/iss2/5

It is stated in ORS 458.505 Community action agency network as delivery system for federal antipoverty programs grant funding and states; "*The department, in its sole discretion, may allocate the funds in any method that ensures statewide geographic coverage without regard to an existing distribution formula, including through a competitive grant or contract process. [2020*

*s.s.2 c.10 §41]* but this conflicts with ORS 458.650 Emergency Housing Account; grant policies

(7) Twenty-five percent of moneys deposited in the account pursuant to ORS 294.187 are dedicated to the emergency housing assistance program for assistance to veterans who are homeless or at risk of becoming homeless. [1991 c.740 §7; 2007 c.70 §268; 2011 c.605 §2; 2013 c.646 §3; 2015 c.180 §27; 2017 c.350 §1; 2019 c.576 §5; 2021 c.18 §7; 2021 c.448 §5a. How can you apply 25% to veterans and it not be considered exclusive? Shouldn't the weight of race, age, disability, gender, homelessness be equitable? Shouldn't all groups get equal access to funding for housing? By reserving a specific amount for any category, it discriminates against another unless equal in coverage. A third example is shown in *Breaking New Ground* Oregon's Statewide Action Plan 2019-2023 (See attached Exhibit B)  On page 20, 21,47,48 it discusses race, on page 25 it discusses homeless, children and veterans, on page 34 it discusses people with developmental disabilities, mental health related issues, older adults, people with addiction issues. But again, Domestic Violence Victims or DV services are not mentioned within any of the 72 pages. Exhibit C27-28

Is this why Domestic Violence Victims cannot find equity in services and programs in the State of Oregon? Or are there other reasons that discriminatory practices continue in the community programs? Is the disparity treatment because of the neglected duties of the agencies responsible for oversight?

Since women are more often the victims of abuse, this also discriminates against sex which is a violation of the *Fair Housing Act's Discriminatory Effects Standard, 78 Fed.Reg. 11460 (2013).* Beyond the discrimination against sex, Domestic Violence Victims also battle a stigma and alienating attitude by agencies and staff that are supposed to be supporting them. These agencies get a portion of their grant funding *because of* the victims, yet they find any reason they can to

"redistribute" the funds back into their "administration fees."  This is evident by staff at Yamhill Community Action when Ben Steiner stated on July 26, 2023 "*At the moment our deposit assistance program is on hold due to a lack of funding causing us to have to close our waitlist. Because of that, we cannot pay deposits or help with related moving cost at this time. You are welcome to check back in occasionally to see if this has changed as our programs change frequently. I apologize for any inconvenience.*" Ex C-19

The Supreme Court has repeatedly held that Title VI regulations validly prohibit practices having a discriminatory effect on protected groups, even if the actions or practices are not intentionally discriminatory. (See *Guardians Ass'n v. Civil Serv. Comm'n, 463 U.S. 582, 643 (1983) (Stevens, J., dissenting) (citing Lau, 414 U.S. at 568, 571 (Stewart, J., concurring) and Fullilove v. Klutznick, 448 U.S. 448, 479 (1980) (opinion of Burger, C.J.)); Alexander v. Choate, 469 U.S. 287, 293 (1985)).*

*(See Windsor v. Regency Property Management, Inc., a domestic violence survivor prevailed in state court on a disparate impact challenge to a private landlord's refusal to rent to a survivor of domestic violence under state legislation analogous to the Fair Housing Act. ##allowing nondisabled, non homeless, non victims to move in before someone needing an accommodation) and Department of Housing and Urban Development (HUD) found probable cause that the zero tolerance policy contravened the FHA. 199*
*EMILY J. MARTIN & DEBORAH A. WIDISS, supra note 160, at 5.*

Additionally, sometimes the relevant policy or practice could be the failure to do something, or even the failure to have a policy. In other words, inaction can exert a disproportionate adverse effect. Guardian Real Estate Services who processes the applications in the Exhibits B4-52

provided, neglected to act or respond in any fashion over the last year to numerous attempts to communicate my reasonable accommodation requests and VAWA rights and protections. *(See, e.g., Maricopa Cty., 915 F. Supp. 2d at 1079)*

Similarly, where law enforcement agencies fail to train their officers, a failure to properly assist persons who are limited English proficient often follows. *(See, e.g., U.S. v. Town of E. Haven, No. 3:12–cv–1652, 2012 WL 5869974, ¶ 43 (D. Conn. filed Nov. 20, 2012)..*" Law enforcement officers in Baker City, Eugene, and Salem have threatened, exposed, harassed, and violated my rights without any regard to my disabilities or safety. (See Ex B-13)

Oregon Housing Authorities, property managers, and their oversight committees Community Action Partnership for Oregon (CAPO), OHCS, and BOLI discriminated against my disabilities, sex, and familial status. The also allowed fraud and waste of grant funds by staff because of their failure to regulate the agencies. Exhibits (A-7, 14), (B-5,6,24, 28,51), (C-7,11-13)

Each emergency transfer plan must meet the requirements in 24 CFR 5.2005(e) and include the following program requirements:

1. If the program participant is entitled to protection, the entity designated to receive documentation requests must notify the owner in writing that the program participant is entitled to protection under VAWA and work with the owner on the program participant's behalf. Any further sharing or disclosure of the program participant's information will be subject to the requirements in 24 CFR 5.2007.

2. Relocation assistance for displaced persons, in general; A displaced person (defined in paragraph (c)(2) of this section) must be provided relocation assistance at the levels described in, and in accordance with, the URA and 49 CFR part 24. A displaced person must be advised of his or her rights under the Fair Housing Act (42 U.S.C. 3601 et seq.). Whenever possible, minority persons shall be given reasonable opportunities to relocate to comparable and suitable decent, safe, and sanitary replacement dwellings, not located in an area of minority concentration, that are within their financial means. This policy, however, does not require providing a person a larger payment than is necessary to enable a person to relocate to a comparable replacement dwelling. (See 49 CFR 24.205(c)(2)(ii)(D).) As required by Section 504 of the Rehabilitation Act (29 U.S.C. 794) and 49 CFR part 24, replacement dwellings must also contain the accessibility features needed by displaced persons with disabilities.

3. Minimizing displacement. Consistent with the other goals and objectives of Emergency Solutions Grant (ESG), the recipient and its subrecipients must assure that they have taken all reasonable steps to minimize the displacement of persons (families, individuals, businesses, nonprofit organizations, and farms) as a result of a project assisted under Emergency Solutions Grant (ESG). (See

The requirements in 24 CFR part 5, subpart A are applicable, including the nondiscrimination and equal opportunity requirements at 24 CFR 5.105(a) and the housing counseling requirements at 24 CFR 5.111. Section 3 of the Housing and Urban Development Act of 1968, 12 U.S.C. 1701u, and implementing regulations at 24 CFR part 75apply, except that homeless individuals have priority over other Section 3 residents in accordance with § 576.405(c)576.402

Participation in HMIS. The recipient must ensure that data on all persons served and all activities assisted under ESG are entered into the applicable community-wide HMIS in the area in which those persons and activities are located, or a comparable database,

in accordance with HUD's standards on participation, data collection, and reporting under a local HMIS. If the subrecipient is a victim service provider or a legal services provider, it may use a comparable database that collects client-level data over time (i.e., longitudinal data) and generates unduplicated aggregate reports based on the data. Information entered into a comparable database must not be entered directly into or provided to an HMIS. Policies and procedures for coordination among emergency shelter providers, essential services providers, homelessness prevention, and rapid re-housing assistance providers; other homeless assistance providers; and mainstream service and housing providers (see § 576.400(b) and (c) for a list of programs with which ESG-funded activities must be coordinated and integrated to the maximum extent practicable);er § 576.400(d); conducting the initial evaluation required under § 576.401(a), in PHS Act Sec. 1947), false statements or failure to disclose certain events (PHS Act Sec. 1946) Exhibit C-27-32


42 U.S. Code § 12132 - Discrimination

Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.


42 U.S. Code § 1437f - Low-income housing assistance states under the preferences for Selection of Families and Disapproval of Owners;

1. **Content**-Each system of preferences established pursuant to this subparagraph shall be based upon local housing needs and priorities, as determined by the <u>public housing agency</u> using generally accepted data sources, including any information obtained pursuant to an opportunity for public comment as provided under <u>section 1437c–1(f) of this title</u> and under the requirements applicable to the comprehensive housing affordability strategy for the relevant jurisdiction.

2. **Selection of tenants-** Each housing assistance payment contract entered into by the <u>public housing agency</u> and the <u>owner</u> of a dwelling unit) <u>[2]</u> shall provide that the screening and selection of <u>families</u> for those units shall be the function of the <u>owner.</u> In addition, the <u>public housing agency</u> may elect to screen <u>applicants</u> for the program in accordance with such requirements as the <u>Secretary</u> may establish. That an <u>applicant</u> or participant is or has been a victim of domestic violence, dating violence, or stalking is not an appropriate basis for denial of program assistance or for denial of admission if the <u>applicant</u> otherwise qualifies for assistance or admission

PIH Notice 2021-15 Section 9g of PIH Notice 2021-15, American Rescue Plan Act of 2021, Pub. L. No. 117-2, §3202, 135 Stat. 4; 42 U.S.C. § 1437f(o)

HA§ 886.339 - Emergency transfers for victims of domestic violence, dating violence, sexual assault, and stalking. further provides that HUD may waive any provisions of the United States Housing Act of 1937 are regulations applicable to such statute used to administer the amounts made available under section 3202 (except for requirements related to fair housing, non-discrimination, Labor Standards, and the environment) upon a finding that any such waivers or alternative requirements are necessary to expedite or facilitate the use of

**(B)Tenant-based assistance; rent exceeding payment standard**

For a family receiving tenant-based assistance, if the rent for the family (including the amount allowed for tenant-paid utilities) exceeds the applicable payment standard established under paragraph (1), the monthly assistance payment for the family shall be equal to the amount by which the applicable payment standard exceeds the greatest of amounts under clauses (i), (ii), and (iii) of subparagraph (A)

YCAP, Yamhill Housing Authority, Northwest Oregon Housing Associates, Broadleaf Arbor Property Management, Guardian Real Estate Services, Viridian Property Management, North Bend Housing Authority, Clackamas Women's Services, St. VDP, Salem Housing Authority, Pacific Source Insurance, EOCCO, GHOBI, Mayday Inc,, Roseburg Inn, Shelter from the Storm, The Harbor, ORCCA, CAT, The Safe Project, Community Action Partnership of Oregon, Lane County Housing Authority, have all violated my protected rights to housing under VAWA, the ADA, Title IV, the 8th Amendment, state law, HUD and Fair Housing regulations. This list is not inclusive. There is no justifiable or legitimate rationale for this continued exclusion of women. I am extremely low income (very recently zero income), chronically homeless, immune compromised, covid affected, disabled, victim of domestic violence, without access to showers, laundry, food, housing, medical care, dental care, therapy, and eye care. Why would I chose this existence? An overwhelming amount of evidence shows disparate impact because of discrimination against disabilities, and sex. (See all Exhibits)

Additionally, OHCS allows expenses such as catered lunches for people not even employed by Oregon as long as it is coded to "training" and coffee creamers, napkins, stir sticks are an allowed expense. Isn't it more important for people to get off the streets then to feed random extras catered food? Isn't it more important that someone has access to medical care, a shower, a bed, hot food, and a life? Countless times over the last year I have been told "there are no cooling shelters, there

are no beds available, there are no showers in town, we don't have any budget left for you to do a load of laundry, etc." I am living like an animal while the state is deciding and clarifying how to disperse extra coffee supplies. Is this equitable? The legislature did not intend for people to suffer to the point of suicide, while the people in charge of the funds that are meant to support people in need, are squandering the money on unnecessary items. My medication is necessary. My sleep is necessary. The language in their own policy and training demonstrates how they will find a loophole or grey area and manipulate it, and when that cannot be done…they just "accidentally misplace" receipts. Exhibit C-23,24.27

"Miscellaneous supplies (including but not limited to: bottled water, coffee, creamer, utensils, paper supplies, small appliances, employee meals) outside of normal office supplies is not specifically addressed in the Cost Principles. *200.437 Employee Health and Welfare Costs* states that (a) costs incurred in accordance with the non-federal entity's documented policies for the "improvement of working conditions, employer-employee relations, employee health, and employee performance" are allowable. OHCS agrees to allow the purchase of miscellaneous supplies for staff use with OHCS funds if all of the following conditions are met by the subrecipient." *(See: JANUARY 2019 OREGON HOUSING AND COMMUNITY SERVICES FISCAL MONITORING QUARTERLY NEWS https://www.oregon.gov/ohcs/for-providers/Documents/grant-unit/2019-Q1-Fiscal-Newsletter-Vol-1.pdf)*

The auditors find Oregon's non-profit agencies and housing authorities cannot provide receipts for expenditures, cannot explain why staff is getting paid more than they should, cannot explain where missing inventory of major equipment purchases are, and the mismanage of grant money is perpetuated by the lack of oversight. Then when the state agencies are fined by the IRS, HUD, or the DOJ, they can escape punishment by saying they will use the amount they were to pay in fines

to retrain employees and improve systems. In essence they are re-paying employees to retrain employees during weekend long training seminars hosted at resorts with catered lunches. Is this what legislature intended as allowable costs paid for by tax paying citizens? Is this why Oregon has a tremendous homeless problem, drug epidemic, and crime issues? (See Exhibit 2022 audit report)

DHHS-DSS has an obligation to make and/or provide reasonable accommodations unless such action would result in a fundamental alteration of DHHS-DSS Work First services, programs, or activities or cause DHHS-DSS an undue financial or administrative burden.

*The OCR has issued policy guidance that clarifies the obligations; Title II of the ADA and Section 504 impose on State and local government entities, and on recipients of Federal financial assistance from HHS involved in the administration of TANF programs. (See U.S. Department of Health and Human Services, Office for Civil Rights Prohibition Against Discrimination on the Basis of Disability in the Administration of TANF (Temporary Assistance for Needy Families) (July 19,2007) <http://www.hhs.gov/ocr/prohibition.html>, cited in Administration for Children and Families, U.S. Department of Health and Human Services, Reauthorization of the Temporary Assistance for Needy Families (TANF) Program; Final Rule, 73 Fed. Reg. 6772, 6775 (Feb. 5,2002)

DHS is to provide the client rights and responsibilities in the TANF program that are readable and understandable by all clients, especially those with learning disabilities or mental health impairment accommodate the complainant's disability and thus subjected the complainant to disability-based discrimination.

Lane County Department of Human Services violated the ADA and Section 504. There are alternative options that would have allowed me equal access to participate in the TANF program and to have the

proper due process rights afforded to me during the hearing process with the ALJ and Oregon Administrative Hearings office.  Exhibit C-26

(1) Effective screening and assessment would have identified the nature of my disabilities, as well as the alternatives that could be made so that woman could successfully participate in the opportunity for a more in-depth assessment when screening indicates a possible disability;

(2) develop procedures to ensure that caseworkers have the support they need to provide reasonable accommodations to clients who are identified as having disabilities;

(3) incorporate into DHS client sanction procedures that the consideration of a disability as a potential reason for client non-compliance with TANF program requirements, including by not sanctioning clients when DHS determines that non-compliance was caused by disability;

(4) provide and apply the 1115 and other waivers the State of Oregon has adopted

(5) apply the same protections and rights that VAWA and HUD have implemented to negate sex based discrimination so that women that have been Victims of Domestic Violence have equal access to programs and services. Especially when DV-TANF is being implemented by the state already.

Since the port in Application paperwork for the HCV was not completed until after 9-6-22 then my voucher would not have been finalized or issued. 60 days after 9-6-22 means voucher would expire 11-5-22 at the earliest.

Exhibit B-11,16 is HUD regulations regarding VAWA protections stating that exceptions to policy make expiration of HCV 6 months after issuance due to difficulties a victim has while fleeing. See transfer. *(See 24 CFR 5.2005e(10).) Requires housing providers to make emergency transfer plans available upon request, and to make them publicly available whenever feasible.*

*Provides for a six-month transition period to complete an emergency transfer plan and provide emergency transfers, when requested, under such plan. (See $5.2005e or applicable program regulations)*

*And this was violated when they refused to allow the rental I was approved for.*

*Provides that emergency transfer plans must allow for a tenant to transfer to a new unit when a safe unit is immediately available and the tenant VAWA would not have to apply in order to occupy the new unit (§ 5.2005e(5)).*

*$886.139 Emergency transfers for victims of domestic violence, dating violence*

*In addition to following requirements in 24 CFR 5.2005, when a safe unit is not immediately available for a victim of domestic violence, dating subpart L. (Protection for Victims) qualifies for an emergency transfer. Covered housing providers must: (1) Review the covered housing provider's existing inventory of units and determine when the next vacant unit may be available*

*The regulations of 24 CFR 5.2005e Provide a listing of nearby HUD subsidized rental properties, with or without preference for persons of domestic violence, dating*

*Retains the provision of HUD's regulations implementing VAWA 2005. Emergency transfer for those HUD programs covered by VAWA 2005, which states that the HUD-required lease, lease addendum, or $5.2005€(11) tenancy addendum must include a description of the specific protections afforded to the victims of VAWA crimes. (See $5.2005(a)(4).]*

*(See A disparate impact theory, a plaintiff must show "that a particular facially-neutral practice actually or predictably imposes a disproportionate burden upon members of the protected class."190 In contrast to the Equal Protection Clause, the FHA does not impose an intent requirement on*

*plaintiffs alleging disparate impact. Next, the burden shifts to the defendant to establish that the challenged actions "furthered, in theory and in practice, a legitimate, bona fide, governmental interest and that no alternative would serve that interest with less discriminatory effect." In order to prevail once a defendant has established a bona fide objective, a plaintiff must show that the defendant unreasonably failed to adopt an alternative policy that would serve the same end in a less discriminatory manner. EMILY J. MARTIN & DEBORAH A. WIDISS, supra note 160, at 3-5.)*

## VI. Supporting Statements

1.  I have video footage and recorded interactions where I have been denied access to medical care by hospital staff, given improper treatment, prescribed incorrect medication, and unable to access medical, dental, and eye care, and unable to access therapy. Oregon Health Authority has denied every request for a hearing I have submitted, and hospital grievance policies and review boards do nothing to satisfy the complaints for violations, they simply question you in a fact gathering interview in an effort to protect themselves.

2.  I have a legally recorded interaction where I was threatened with physical violence and forced to conform to their religious requirements at Roseburg's Samaritan Inn domestic violence shelter,

3.  I have recorded interactions of me being kicked out in the middle of the night in the dead of winter from Baker City's domestic violence shelter Mayday Inc. with my pets due to retaliation by the Director of Mayday Inc.

4.  I have recorded interactions of being falsely ticketed twice in Baker City. The Supreme Court stated in Brady vs Maryland that a defendant has a right to exculpatory evidence. When the state failed to disclose material exculpatory evidence, my due process rights were violated.

5.  I have legally recorded conversations detailing how I was housed in a 15-foot 1960's camper without running water, electricity, or plumbing, and given a bucket to use for a restroom. The mattress was moldy and infested with bugs. This was Baker City's New Directions Behavioral Heath's answer to finding me safe and stable housing. The owner of the trailer was given 3 month's rent and deposit with a flex funds request form which was paid for by EOCCO and GHOBI, regardless that I stayed there for only 4 days before I packed up my belongings and informed New Directions staff I would rather sleep in my car then the filthy conditions they housed me in, and gave them pictures showing the conditions. Then my case manager and the director retaliated by disclosing personal information to a complete stranger in the community, verified in an email to me and refusing to give me my medical records that I needed to submit to the Social Security Office.

6.  I have had to relinquish my ESA because I could not cause it to suffer the same miserable existence as I was while living in my car.

7.  The USPS in Salem flagged my mail and have refused to forward it or give it to me. I have not received mail for over 2 months. All attempts to rectify this by calling Portland's distribution center and the northwest regional Postmaster General have failed.

8.  I have legally recorded conversations exposing HIPPA violations, denied services, finances, and hearings from Salem Social Security Office from October 2022 to present. After filing a complaint, I was retaliated against by a staff member when they made a false report of threat to Homeland Security. I am now banned from ever entering any Social Security office anywhere. I know the report made by the staff is false because I have the recorded conversation that he referenced. Homeland Security has informed me that they are sending the report to the Department of Justice.

9.  The next day I was coincidentally arrested by Salem law enforcement for trespassing. While in jail

10. I have video evidence of harassment and threats by the Eugene police department when they were going to smash out my windows and drag me out of my car because I was sleeping.

11. Cristo informed me in no uncertain terms that she was "working on claims from March so it would be a while" until I threatened a lawsuit. Cristo then had the entire next week available, Monday through Friday 9-5, for my complaint. When I asked how they all of a sudden had all this free time I was told "we looked at your case and made an exception." Except nothing has been done about my discrimination claims. There are clear violations of my rights by property managers and housing authorities, (See Exhibits (A-7, 14), (B-5,6,24, 28,51), (C-7,11-13) yet when I repeatedly ask for clarification or a corrected report I am ignored. I was even discriminated against Cristo during a recorded phone conversation when she stated "my other clients have it worse" which was her personal opinion and emotion in direct conflict with her obligation as a state employee to follow procedure. Afterwards she retaliated against me by saying "if you are going to be rude then...." Since then my complaint is stalled.

## VII.    Conclusion

What do all of these agencies have in common?

They all have access to the HMIS platform or work very closely with agencies in a formal contractual arrangement set forth in their Memorandum of Understanding, MOU's, or by informal conversations with their peers.  It has even spilled over into the state of Washington, as I understand Oregon and Washington share the database.

They all have violated my rights in some manner, refused services, denied access to a better existence, perpetuated abusive and traumatic treatment, exacerbated an already impossibly difficult life, and created barriers to health, wellness and prosperity for my children and myself.

## VII.    Relief

a.    For this, I respectfully request the Court to impose any <u>provisional remedies</u>, restitutionary measures, or coercive remedies through temporary injunctions. The Court holds within its discretionary power to find equitable remedies that are due and proper to prevent further harm. I would like my EHV issued immediately along with the assistance allowed by HUD for deposit, rent, moving, and application fees.

The United States Supreme Court has construed the Eleventh Amendment to bar suits against state officers who are sued in their official capacity for damages or other retroactive relief but allows suits for prospective declaratory or injunctive relief against state officials acting in their official capacity.

b.    Any monetary compensation for my out-of-pocket expenses incurred in addition to the pain and suffering endured.

## VII. Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

Elizabeth A. Weber          August 4, 2023
Oregonbooks1@gmail.com
503-339-6115
Homeless-no address

Cc: DOJ

| Community Action Partnership of Oregon | Bureau of Labor and Industry | Oregon Housing and Community Services |
|---|---|---|
| Executive Director Janet Allanach | Commissioner Christina Stephenson | Director Andrea Bell |
| 2475 Center Street, NE | 800 NE Oregon St | 725 Summer Street NE, Suite B |
| Salem | Portland | Salem |
| OR 97301 | Oregon 97232 | OR 97301-1266 |
| (503) 316-3951 | (971) 245-3844 | 503-986-2000 |

I request to waive the following requirement and allow filing electronically of any future documents to the court or respondents listed above, I have attached an application For CM-ECF Registration As A Self-Represented Party.

I have provided I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.